RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0156P (6th Cir.)
File Name: 03a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ISLE ROYALE BOATERS
ASSOCIATION et al.,
    *Plaintiffs-Appellants,*

    *v.*

No. 01-2137

GALE NORTON et al.,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 99-00152—Gordon J. Quist, District Judge.

Argued: December 13, 2002

Decided and Filed: May 23, 2003

Before: BATCHELDER and MOORE, Circuit Judges;
FORESTER, Chief District Judge.*

———————————

### COUNSEL

**ARGUED:** Robert J. Jonker, WARNER, NORCROSS &
JUDD, Grand Rapids, Michigan, for Appellants. Todd S.

_____

* The Honorable Karl S. Forester, Chief United States District Judge
for the Eastern District of Kentucky, sitting by designation.

Kim, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellees. **ON BRIEF:** John J.
Bursch, WARNER, NORCROSS & JUDD, Grand Rapids,
Michigan, for Appellants. Todd S. Kim, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., Glenda G.
Gordon, UNITED STATES ATTORNEY, Marquette,
Michigan, for Appellees.

MOORE, delivered the opinion of the court, in which
FORESTER, D. J., joined. BATCHELDER, J., joined in J.
MOORE's opinion as to Parts I and II and in the judgment.

———————————

### OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. This case
involves a challenge to the General Management Plan that the
National Park Service issued for Isle Royale National Park on
August 17, 1998. The plaintiffs, the Isle Royale Boaters
Association and a number of individual boaters and other
visitors to Isle Royale, argue that by removing certain docks
and altering trail access and shelter facilities at other docks,
the Park Service's 1998 General Management Plan will
significantly limit the boaters' access to the island and
contravene the intent of Congress when it made Isle Royale
a National Wilderness Area in 1976. We conclude that the
addition, removal, and relocation of docks proposed in the
General Management Plan is within the discretion granted by
the Wilderness Act and the National Park Service's Organic
Act. Thus we **AFFIRM** the district court's decision granting
summary judgment to the defendants.

### I. BACKGROUND

Isle Royale National Park consists of a series of islands in
the northern reaches of Lake Superior. The main island is
about forty-five miles long and nine miles wide; it is
surrounded by about four hundred smaller islands. It has been

a national park since 1931, and it was designated as a national wilderness area in 1976. The park's approximately 17,000 visitors each year arrive by ferry, seaplane, and private boat to hike, camp, and enjoy the park's waters. The park has 165 miles of trails, many campgrounds, and one overnight lodge. Although the park is closed to visitors from October through mid-April, its year-round residents include moose, timber wolves, snowshoe hares, and beavers, as well as about seventy rare plant species.

In 1995, the National Park Service formally began the process that would ultimately lead to a General Management Plan (GMP) to take the place of the master plan that had governed the park since 1963. The GMP would serve to guide "future use of resources and facilities, to clarify research and resource management needs and priorities, and to address changing levels of park visitation and use." Joint Appendix ("J.A.") at 375 (GMP at 4). General management plans usually provide guidance over a fifteen- to twenty-year period. Following a series of public forums and newsletters, a draft of the GMP was distributed in March of 1998. After a further period of public comment, the Park Service issued the final version on August 17, 1998.

Among other concerns, the GMP sought to address visitors' complaints regarding noise levels within the park. The GMP noted that although Isle Royale receives fewer visitors than many national parks, it has a high number of overnight visitors, and "[w]ith Isle Royale's density of backcountry use, differing preferences and expectations are especially evident." J.A. at 376 (GMP at 5). "Some visitors complain that their wilderness experiences are being compromised by visual intrusions and noise from park developments, jets and other aircraft, boats, and the behavior and activities of other visitors, such as having loud parties and playing stereos." J.A. at 376 (GMP at 5). Because Isle Royale's designation as a wilderness area "carries with it certain expectations for visitors, such as solitude and quiet," J.A. at 376 (GMP at 5),

the GMP aimed to "separate motorized and nonmotorized uses in some areas," J.A. at 401 (GMP at 34).

As part of an effort to separate nonmotorized uses of the park from motorized uses of the park, the final GMP included a number of changes that would affect motorized boat users' access to the park. Prior to the GMP, the park had twenty docks on Lake Superior. Under the GMP, the park would eliminate some docks, relocate others, and build some new docks, so that the park would ultimately offer twenty-two docks. However, although the changes would result in an aggregate increase in the number of docks, and although boaters would still be able to access all areas of the park, albeit with perhaps a longer hike from a relocated dock, the changes would in some ways limit boaters' access to shelters and trails. Under the GMP, the Park Service would eliminate the docks at Three Mile, which gave boaters access to eight shelters, at Duncan Bay, which offered two shelters, and at Siskiwit Bay, which gave boaters direct access to the island's trail system. The dock at McCargoe Cove, which offered six shelters and was directly on the trail system, would be moved approximately one mile toward the mouth of the cove, so that boaters could reach the main trail system and the shelters only by a one-mile "spur" trail. Similarly, the GMP calls for the Park Service to remove access to the main trail system from the dock at Chippewa Harbor by eliminating the two-mile Indian Portage Trail that connected them. Boaters could still reach the main trail system via other docks.

The three docks that the GMP would eliminate entirely would be replaced with five new docks. However, unlike the three previous docks, which were all located on the main island, four of the five new docks would be on surrounding islands with no access to the main island. These four docks would be at Johns Island, Washington Island, Wright Island, and Crystal Cove; of the four, none of the sites would have shelters immediately, but historical structures at Washington Island and Crystal Cove would be adapted for such use. The fifth new dock would be at Fisherman's Home. The

Fisherman's Home dock would offer no access to the main trail system, but the site has historical structures that would be considered for conversion to shelters. Nonshelter camping would be available at all five sites.

Finally, the GMP calls for the Park Service to replace a dock at Hay Bay. The GMP does not call for rebuilding the dock at Huginnin Cove, which was damaged by weather in the mid-1980s.

The Isle Royale Boaters Association (IRBA) and five individual plaintiffs filed suit in federal district court on August 18, 1999. According to their First Amended Complaint, the plaintiffs include an association representing more than six hundred members who regularly visit Isle Royale and boat in its waters, four individuals who frequently visit Isle Royale in their boats, and one individual who regularly visits the island to canoe, hike, and fish. The plaintiffs alleged that the Park Service's GMP and the process undertaken to adopt it violated the Wilderness Act; Public Law 94-567, which is the act designating Isle Royale as a wilderness area and which the parties refer to as the Isle Royale Wilderness Act; the 1916 Organic Act that established the National Park Service; the National Environmental Policy Act; and the Administrative Procedure Act.

On June 6, 2001, the district court denied the plaintiffs' motion for summary judgment and granted the defendants' motion for summary judgment. The Park Service's proposed plan was not arbitrary or capricious, the district court ruled, because the Wilderness Act gave the Secretary the authority to regulate boat use in wilderness areas such as Isle Royale. Moreover, the court reasoned, the GMP would result in a net increase of docks, raising the total from twenty to twenty-two, and would still permit those using motorboats to reach the park's shelters and trails by hiking, kayaking, and canoeing, just as other island visitors did. Because the Isle Royale Wilderness Act "contemplates the continued maintenance of docks at the Park," but not "the continued maintenance and

existence to perpetuity of *every* dock *currently* at the Park," J.A. at 742, and because the Park Service's decisions regarding the docks were not arbitrary or capricious under the Wilderness Act and the Isle Royale Wilderness Act, the court would not intervene. The court also rejected the plaintiffs' Organic Act and National Environmental Policy Act arguments, as well as the plaintiffs' post-complaint arguments that the GMP violated the Rehabilitation Act and the ADA, none of which allegations the plaintiffs press on appeal.

The plaintiffs timely appealed, and we have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's decision awarding summary judgment to the defendants and apply the standard of review appropriate to a review of the agency action in question. *Community First Bank v. Nat'l Credit Union Admin.*, 41 F.3d 1050, 1054 (6th Cir. 1994). Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), we first determine "whether Congress has directly spoken to the precise question at issue," *id.* at 842; if it has not, we ask "whether the agency's answer is based on a permissible construction of the statute," *id.* at 843. Section 706(2)(A) of the Administrative Procedure Act permits us to set aside the agency's determination only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" 5 U.S.C. § 706(2)(A); *see also Spitzer Great Lakes Ltd. v. United States Envtl. Prot. Agency*, 173 F.3d 412, 414 (6th Cir. 1999).

## II. THE STATUTES

Given the obligations that the Wilderness Act and the Organic Act impose on the agencies charged with administering wilderness areas and national parks, the National Park Service's decision to separate uses on Isle Royale by removing, adding, and relocating docks is consistent with Congress's instructions. Although the plaintiffs do not explicitly address the Organic Act in their appellate brief, the plaintiffs challenge the removal of three

docks that are in areas designated only as national parkland, not as wilderness area; accordingly, we review the effects of the GMP on the docks at Siskiwit Bay, McCargoe Cove, and Three Mile for arbitrariness and capriciousness with respect to the Organic Act. We review the GMP's effects on the other docks in light of the Wilderness Act and the Isle Royale Wilderness Act. In each case, we ask whether the GMP, and specifically the removal, addition, and relocation of docks, is inconsistent with the clear intent of Congress as expressed in the relevant act. *See Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 826 (10th Cir. 2000).

## A. National Park

Isle Royale has been a national park since 1931. As a national park, its purpose is "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. Prior to 1976, when Congress designated most of Isle Royale a wilderness area, the Secretary of the Interior had the power to remove docks or alter boaters' access to the park as the Secretary saw fit. This power came pursuant to 16 U.S.C. § 1a-2(h), which authorizes the Secretary to "[p]romulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the National Park System."

The Organic Act makes no reference to the placement of docks or the access that docks must provide to national parkland. Accordingly, the National Park Service has broad discretion to determine where docks are located on Isle Royale and, indeed, whether to permit docks at all; although the statute requires the Secretary to provide for the enjoyment of national parklands, 16 U.S.C. § 1, the statute does not require the Secretary to provide access via docks or boats. In the GMP, the National Park Service proposed eliminating the Siskiwit Bay dock, which had remained intact only because

it was protected by an artificial breakwall that disrupted natural currents; moving the McCargoe Cove dock closer to the mouth of the cove in order to reduce noise on the main trail system; and removing the Three Mile dock in order to "ease use pressure, separate uses, and eliminate the need to maintain a public dock in this very exposed location." J.A. at 404 (GMP at 37). These goals, and the GMP's plan to achieve them with its changes to the three docks, are well within the policies identified in the Organic Act. Removing docks helps to conserve scenery, and moving docks to reduce noise on the trails facilitates the enjoyment of the scenery, natural objects, and wild life that the island offers. This is consistent with Congress's requirements. *See* 16 U.S.C. § 1.

This case is somewhat analogous to that faced by the Ninth Circuit in *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445 (9th Cir. 1996). There, a group of bicycle enthusiasts challenged a plan adopted for the Golden Gate National Recreation Area as impermissibly restricting the bikers' access to the national park. The court held that the plan, which left a number of trails closed to bikes, was well within the discretion granted by the Organic Act and the GGNRA Act, which had designated the area a national park. "[T]he GGNRA Act in no way mandates that any particular type of recreation be given primacy over other types. There is simply nothing in the GGNRA Act or the NPS Organic Act requiring the NPS to give bicyclists unfettered reign of the park without regard to the recreational interests of those whose chosen mode of recreation is inconsistent with such unfettered reign." *Id.* at 1461. *See also Mausolf v. Babbitt*, 125 F.3d 661, 668-70 (8th Cir. 1997) (finding that plan to close certain trails to snowmobiles furthered park objectives of "preservation and protection of wildlife"), *cert. denied*, 524 U.S. 951 (1998). Similarly, here, the National Park Service has determined that motorboat users' access must be altered — although arguably not even reduced — in order to separate uses and protect the natural experience, goals perfectly consistent with the Organic Act. Insofar as the GMP affects docks on national parkland, it is neither arbitrary nor capricious.

## B. Wilderness Area

If the Park Service has the power to limit access to the island via docks in areas designated only as national park land, the Park Service *a fortiori* has the power to limit access to the island via docks in wilderness areas. Congress's designation in 1976 of all but a few portions of Isle Royale as wilderness area, to "be administered by the Secretary of the Interior in accordance with the applicable provisions of the Wilderness Act," Act of October 20, 1976, Pub. L. No. 94-567, § 1(f), 90 Stat. 2692 ("Isle Royale Wilderness Act"), did not lessen the National Park Service's obligation to preserve the island's character. 16 U.S.C. § 1133(a)(3) ("[T]he designation of any . . . unit of the national park system as a wilderness area pursuant to this chapter shall in no manner lower the standards evolved for the use and preservation of such park."). Rather, because "[g]reater protections apply to wilderness areas than to ordinary park lands," *Alaska Wildlife Alliance v. Jensen*, 108 F.3d 1065, 1069 (9th Cir. 1997), the designation increased the Park Service's obligation.

There is no question that the Wilderness Act empowers the Park Service to remove or relocate docks in order to "separate motorized and nonmotorized uses," J.A. at 401 (GMP at 34). As a wilderness area, the park is to be administered "for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a). The Park Service must ensure that "the earth and its community of life are untrammeled by man" and that the land "retain[s] its primeval character." 16 U.S.C. § 1131(c). The Secretary thus has broad discretion to preserve the land and its character. Although the Wilderness Act does not specifically mention docks, it does explicitly ban motorboats, structures, and installations, 16 U.S.C. § 1133(c), unless the Secretary decides to permit a pre-existing motorboat use to continue, 16 U.S.C. § 1133(d)(1) (stating that when motorboat use was already established, the use "*may* be permitted to continue"

subject to restrictions) (emphasis added).[1] We cannot believe that Congress would *ban* motorboats but *require* docks without giving some indication that it was doing so. As the removal, relocation, and addition of docks furthers the GMP's goal of separating uses, and thus furthers the Wilderness Act's goal of providing a "contrast" to "those areas where man and his own works dominate the landscape," 16 U.S.C. § 1131(c), we conclude that the GMP is neither arbitrary nor capricious in its effects on the docks in wilderness areas.

## III. LEGISLATIVE HISTORY AND AGENCY STATEMENTS

When a statute's text is unambiguous, there is ordinarily no need to review its legislative history. *See Audette v. Sullivan*, 19 F.3d 254, 256 (6th Cir. 1994). However, there are those "rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989); *accord Immigration and Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987), and IRBA argues that materials not appearing in the text of the statute limit the Park Service's power to move or remove the docks on Isle Royale. Specifically, IRBA argues that Congress intended for the Park Service to preserve boaters' access as it existed when Congress designated Isle Royale a wilderness area in 1976. According to IRBA, legislative

---

[1] IRBA suggests that section 1133(d)(1) is mandatory, and that the Secretary is *required* to permit pre-existing motorboat uses to continue in wilderness areas. Although IRBA is correct that "may" is not necessarily permissive, *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 198-99 (2000), we assume that "may" is using its "common-sense" permissive definition unless the context of the statute suggests otherwise, *United States v. Rodgers*, 461 U.S. 677, 706-07 (1983). Here, where the statute explicitly seeks to ensure that "the earth and its community of life are untrammeled by man," 16 U.S.C. § 1131(c), and adopts, subject to existing private rights, a general ban on motorboat use, 16 U.S.C. § 1133(c), we cannot presume that the National Park Service is required to permit motorboats in wilderness areas.

history shows that in enacting the Isle Royale Wilderness Act, Congress expressed its intention that the designation not enable the Park Service to impose the kinds of significant limitations on boater access that the GMP proposes. IRBA relies on statements by individual legislators, a committee report, and correspondence from the Park Service.

First, IRBA points to legislators' statements during consideration of the bill that designated Isle Royale as a wilderness area. Testifying before the Senate on the importance of protecting the docks, Congressman Philip E. Ruppe, who sponsored the Isle Royale Wilderness Act in the House, expressed his "strong view that the continued maintenance of these facilities is absolutely essential to the continued ease of access and enjoyment the public now associates with Isle Royale National Park." *Wilderness Additions — National Park System: Hearing on S. 1085 and S. 1675 Before the Senate Subcomm. on Parks and Recreation of the Comm. on the Interior and Insular Affairs*, 94th Cong. 118 (1976) (statement of Rep. Philip E. Ruppe) (hereinafter "*Hearing*"). Senator J. Bennett Johnston, who presided over the hearing, responded by agreeing that "everyone agrees that they ought to continue using the boat docks." *Id.* at 120. IRBA argues that this colloquy expressed Congress's intention that the docks remain where they were in 1976 — as made clear by Congressman Ruppe's further suggestion that docks be maintained to protect the enjoyment the public "now associates" with the park, and that boaters be able to use the park "in the same fashion as they have used it heretofore." *Id.* at 119. Although acknowledging that the Park Service could move the docks a couple of hundred yards, IRBA suggests that the legislators' comments make clear that the Park Service could neither remove docks nor move docks in such a way as to alter boaters' access to the island's offerings.

This case presents a clear example of why Congress's intent is better derived "from the words of the statute itself than from a patchwork record of statements inserted by individual legislators and proposals that may never have been adopted by

a committee, much less an entire legislative body." *Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 304-05 (4th Cir. 2000), *aff'd*, 534 U.S. 438 (2002). We are wary of relying on individual legislators' statements, because individual statements are often contradicted or at least undermined by other statements in the legislative record. The statements of Congressman Ruppe and Senator Johnston that IRBA cites suggest at least interest in maintaining boaters' access to the island, if not the all-out prohibition on moving or removing docks that IRBA suggests. However, other statements during the same hearing suggest a similar interest in allowing the Park Service the discretion to manage the docks in accordance with the Wilderness Act's usual provisions. Senator Clifford P. Hansen, for example, questioned the wisdom of "tying the hands of the Park Service," *Hearing* at 121, and Senator Johnston himself noted that conservation groups opposed including in the bill any restrictions on the Park Service's usual discretion, *Hearing* at 120. Although statutory language can sometimes be ambiguous, legislators' statements are almost always cacophonous, and we decline to rely on them here.

Second, IRBA points to language in the report of the Senate Committee on Interior and Insular Affairs that accompanied the Isle Royale Wilderness Act. The committee report, to be sure, indicates that the continued maintenance of the boat docks was a concern. After noting that the Senate had struck language from the House version of the bill that would have required construction and maintenance of boat docks "as long as their purpose is for safety of visitors and the protection of the wilderness resource," the committee report explained the change.

> This technical decision by the Committee should have no effect on the continuance of those activities pursuant to the appropriate provisions of the Wilderness Act.

> The Committee understands that no significant expansion of boat docks numbers is anticipated, but that continued

maintenance of these facilities is essential to the continued ease of access as well as the health and safety of the visitors.

S. Rep. No. 94-1357, at 5 (1976).

Even if this passage reflects the will of Congress, which is questionable, *see Shannon v. United States*, 512 U.S. 573, 583 (1994) (expressing an inability to find "any case . . . in which we have given authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute" and cautioning against reliance on committee report's endorsement of a view that is not linked to any portion of the statute), it does not undermine the discretion that the Wilderness Act's text grants. Taken in full context, the Interior and Insular Affairs Committee's preference for the "continued maintenance" of the docks is subject "to the appropriate provisions of the Wilderness Act," S. Rep. No. 94-1357, at 5. As discussed in Part II, *supra*, docks may be removed or relocated in order that the wilderness areas of Isle Royale be administered "for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a).

Finally, IRBA points to previous Park Service statements in which the Park Service allegedly claimed that passage of the Isle Royale Wilderness Act did, indeed, require the Park Service to maintain the docks as they existed. IRBA pointed to letters that Park Service officials had written over the years in response to park visitors' complaints and requests that the Park Service remove the docks. In several letters, the Park Service responded by stating that "Congress also specifically mandated that existing docks extending into (the non-wilderness of) Lake Superior from wilderness campsites . . . remain and be maintained by the National Park Service." *E.g.*, J.A. at 227, 231, 234. However, even if these responses to visitor complaints about the docks' users constituted final

rulings of the agency, which they do not,[2] "[t]he Secretary of the Interior has the inherent authority to reconsider an earlier agency decision," *Belville Mining Co. v. United States*, 999 F.2d 989, 997 (6th Cir. 1993).

Thus this is not the "rare case[] in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair Enters., Inc.*, 489 U.S. at 242. The legislative history indicates that during consideration of the Isle Royale Wilderness Act, some members of Congress sought explicit statutory protection for boaters' access to Isle Royale. Some members of Congress opposed such statutory protection. A compromise was reached, and although the final bill contained no mention of the docks, the committee report mentioned the docks' importance and stated that the Wilderness Act's usual provisions would apply. It is on those provisions, and those of the Organic Act, that we rely. *See* 16 U.S.C. § 3 (recognizing agency's power to administer national parks as necessary to effectuate purposes of national park system); 16 U.S.C. § 1131(b) (recognizing agency's power to regulate wilderness area as the agency had been empowered prior to the designation as a wilderness area).

### IV. CONCLUSION

Because the addition, removal, and relocation of docks that Isle Royale's General Management Plan proposes will further the statutorily-supported goal of separating motorized and nonmotorized uses and is neither arbitrary nor capricious in

---

[2] *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in formats such as opinion letters are entitled to respect . . . but only to the extent that those interpretations have the power to persuade") (quotations and citations omitted); *Pearce v. United States*, 261 F.3d 643, 648-49 (6th Cir. 2001) (noting that internal operating manual did not constitute an enforceable regulation, which is different from "an interpretative rule, general statement of policy, or rule of agency organization, procedure, or practice").

light of the governing statutes, we **AFFIRM** the district court's decision granting summary judgment to the defendants.