In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3422

ALTO DAIRY, *et al.*,

*Plaintiffs-Appellants,*

v.

ANN VENEMAN, Secretary of Agriculture,

*Defendant-Appellee,*

and

CONTINENTAL DAIRY PRODUCTS, INC., *et al.*,

*Intervening Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02 C 750—**William C. Griesbach**, *Judge.*

ARGUED MAY 21, 2003—DECIDED JULY 15, 2003

Before FLAUM, *Chief Judge*, and POSNER and MANION, *Circuit Judges.*

POSNER, *Circuit Judge.* Dairy farmers located mainly in Wisconsin brought this suit to enjoin an amendment (adopted by the Department of Agriculture after a formal rulemaking proceeding; published at 7 C.F.R. § 1033.7(c)(2); and explained in *Milk in the Mideast Marketing Area; Interim*

*Order Amending the Order*, 67 Fed. Reg. 48743 (July 26, 2002)) to the federal rules regulating the price of milk. These rules are called "milk marketing orders," and so the amendment is also a milk marketing order. The district judge held that the plaintiffs lacked standing to challenge the amendment, not in the Article III sense that the plaintiffs had suffered and would suffer no harm from the amendment, or would derive no benefit from a judgment invalidating the amendment, but in the sense of having been denied by Congress a right to sue. So he dismissed the suit for lack of federal jurisdiction. But he went on to declare that, if he was wrong about jurisdiction, the suit would still have to be dismissed because the plaintiffs' challenge lacked merit. The plaintiffs have appealed, challenging the judge's ruling on standing and also arguing that if there is standing we should reach the merits and vacate the amendment because the Department of Agriculture failed to give them proper notice concerning the relief that might emerge from the rulemaking proceeding. While the Department defends the judge's ruling on standing, it has also responded to the plaintiffs' argument on the merits. The merits having thus been fully briefed, we can decide them if there is standing.

The federal scheme for regulating the price of milk pivots on the fact that milk is more highly valued by the market when it is sold for fluid consumption than when it is sold as an input into the manufacture of cheese or other dairy products. If milk were perishable, as it was in the days before refrigerated storage and transportation, dairy farmers serving urban markets (where milk is more likely to be consumed in fluid form than made into cheese or butter) would get higher prices for their output than dairy farmers remote from cities, who being unable to ship their milk a long distance would perforce sell most of it to manufacturers of cheese and other dairy products. But when refrig-

erated storage and transportation arrived on the scene, it became feasible for the remote dairy farmers—Wisconsin dairy farmers, for example—to ship milk to cities in other states, pushing down the price of fluid milk there and so hurting the dairy farmers who were located near those cities.

This was a natural, procompetitive development, as in other cases in which a reduction in the quality-adjusted cost of transportation enlarges geographic markets. But the federal regulatory scheme for milk, like so much economic regulation adopted during the Great Depression of the 1930s (much of it, however, since abolished as a consequence of the deregulation movement), is premised on dissatisfaction with the results of competition, polemically described as "ruinous" by those producer interests that it pinches. (For a near unintelligible description of conditions thought to render competition among dairy farmers unworkable, see *Nebbia v. New York*, 291 U.S. 502, 517-18 (1934).) To limit the competition between remote and proximate dairy farmers for the lucrative fluid-milk business of the cities, Congress in the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, as amended, 7 U.S.C. §§ 601 *et seq.*, authorized the Department of Agriculture to proceed as follows. The Department fixes a minimum price for each "class" of milk, with class determined by end use: thus the price fixed for milk intended for fluid consumption is higher than the price fixed for milk intended for cheese. This "value of service" pricing, conventional in regulated industries, is actually a form of price discrimination, that is, pricing guided not by cost (the cost of producing milk is the same regardless of the use to which the milk is put by the purchaser), as under competition, but by differences across consumers in willingness to pay. Price discrimination increases sellers' profits, thus counteracting the alleged (though almost certainly

spurious) tendency of dairy farmers to destroy their business by competing overvigorously. More realistically, milk price discrimination is intended to redistribute wealth from consumers to producers of milk.

Farmers of course do not sell directly to the ultimate consumer. The direct purchasers of milk from dairy farmers are referred to as "handlers." They might be owners of supply plants (of which more later), or milk distributors, cheese factories, or other intermediaries in the milk market. It is the handlers who pay the prices fixed by the federal regulators. The revenues generated by the discriminatory pricing scheme and received in the first instance by the handlers are pooled, and each dairy farmer whose sales contributed to the pool receives a share of the revenues that is equal to his percentage not of the total revenues of the pool's members but of their total physical output. By virtue of this method of dividing up the pot, each farmer receives the same price (called a "blended" price) for each unit of milk that he sells regardless of the end use of his milk. A farmer who sold all his milk to a cheese factory (in fact most milk produced in Wisconsin is used to make cheese, rather than being drunk) would receive from the pool the same price per unit of output as a farmer who sold all his milk for fluid consumption, even though the handler would have paid a much lower price for the former than for the latter milk. The result, or at least the intended result, is that the first farmer in our example, the one who sells all his milk to a cheese factory, will have no incentive to divert some of his output to the fluid market, where the price is higher, because the price that he receives for the milk he sells is independent of the use to which that milk is put. Such a diversion, what economists call "arbitrage," would undermine and, if uncontrolled, eventually destroy the scheme of discriminatory pricing and thus reduce the

incomes of dairy farmers as a group. The distant farmers are "kept in their place," as it were—kept selling locally to the cheesemakers rather than trying to sell to fluid-milk distributors in the cities—by being given a share of fluid-milk revenues.

The fly in the ointment, and the cause of the present litigation, is that the Agriculture Department has divided the nation into regions and fixed different blended prices in the different regions. The blended price is higher in regions in which fluid-milk consumption is a higher fraction of total milk use, because in such regions a higher fraction of milk is sold to handlers at the high minimum price that the Agriculture Department has set for milk consumed in fluid form. The "Mideast," which comprises Indiana, Michigan, Ohio, and parts of Pennsylvania and West Virginia, is one of these regions. Wisconsin, which is a large manufacturer of cheese, is not in the Mideast region and the blended price in its region is lower because of the high fraction of its milk output that goes to make cheese rather than being drunk. Naturally, therefore, Wisconsin dairy farmers would like to sell as much of their milk in the Mideast as they can (and for the further reason that the Department has fixed a higher minimum price for milk sold for consumption in fluid form in the Mideast states than in Wisconsin, see 7 C.F.R. § 1000.52)—or rather, they would like as many of their sales as possible to be pooled with the Mideast producers' sales and so be remunerated at the higher Mideast blended price. For they have no wish to incur the costs of actually shipping their milk to the Mideast; they would much rather continue to ship it to nearby cheese factories in Wisconsin, their traditional customers. To the extent that Wisconsin milk production is pooled with that of the Mideast dairy farmers, the latter will lose revenues because the Wisconsinites will be taking out revenue at the

Mideast blended price while contributing to the pool the revenue generated by sales at lower prices to the cheese factories. If *all* their output were sold to cheese factories, the revenue they would be contributing to the pool would be their output multiplied by the low price fixed for the sale of milk destined for use as an input into the making of cheese, while the revenues they would be receiving as their share of the Mideast pool would be their output multiplied by the Mideast blended price.

To limit the type of arbitrage described in the preceding paragraph, the Agriculture Department has long required that a supply plant—a handler that buys milk from the farmer for storage and redistribution—resell 30 percent of its milk into a region in order to be eligible for the blended price fixed for that region. If it does sell 30 percent there, however, its entire output, not just the 30 percent, qualifies for the region's blended price. Moreover, the Agriculture Department also authorizes a practice called "paper pooling," which permits a supply plant in one region to "associate" with dairy farmers in another region, who by virtue of the "association"—which can be completely informal—are treated as if they shipped their milk to the supply plant. Thus, if a dairy farm in Indiana is "associated" with a milk supply plant in Wisconsin, but sells its milk to a milk distributor in Indiana and ships the milk directly there rather than via the supply plant, its sales, though entirely within Indiana, nevertheless are counted as part of the 30 percent of the Wisconsin supply plant's sales that must be made in the Mideast region in order to allow the supply plant's entire sales to be included in the Mideast pool. Ten percent of the 30 percent must actually be shipped into the distant region, but the other 27 percent need not be. So the nominal 30 percent requirement is reduced to 3 percent. A supply plant in Wisconsin, buying all its milk from local farmers, need ship

only 3 percent of its milk to the Mideast to qualify for the Mideast blended price for its entire output, so long as another 27 percent is supplied by Mideast dairy farmers associated with the Wisconsin plant.

The rationale for paper pooling, which makes perfectly good sense, is that farmers should be permitted to ship directly to distributors, without having to go through supply plants. And until 2000, paper pooling did not create significant arbitrage opportunities, because the Agriculture Department forbade distant supply plants to receive the full blended price in the region of their associated dairy farmers. But the prohibition was rescinded that year, see 7 C.F.R. § 1000.50, and with that rescission paper pooling became a loophole through which the Wisconsin dairy farmers rushed. The amendment they challenge closes the loophole by forbidding the qualifying 30 percent to include local shipments from distant supply plants. 7 C.F.R. § 1033.7(c)(2). If a supply plant in Wisconsin wants to associate with a dairy farmer in the Mideast region, so that sales by that farmer will qualify for the Mideast blended price, the plant must now require the farmer to ship his milk to the supply plant for reshipment to customers in the Mideast. The plaintiffs criticize the requirement because it is often more economical for the dairy farmer to bypass the supply plant, especially as the quality of the milk may drop when it is pumped into and then out of the supply plant, and especially when the farmer and the distributor are near each other but distant from the supply plant. Were the blended price in the Mideast sufficiently high, an Indiana dairy farmer might be induced to ship his milk to a Wisconsin supply plant for resale to an Indiana milk distributor, in order that the dairy farmer's output would contribute to the supply plant's making its 30 percent quota. That would be a great waste. But the plaintiffs' criticism is neither here

nor there, since the only challenge they mount in this court to the amendment is that it was adopted without proper notice to them.

Before we consider that issue, which is the issue on the merits, we must satisfy ourselves that the plaintiffs have a right to seek judicial review of the Agriculture Department's order amending the Mideast milk marketing order. The district judge, as we mentioned, thought they did not. The circuits have divided over the question. Compare *Minnesota Milk Producers Ass'n v. Madigan*, 956 F.2d 816, 817-18 (8th Cir. 1992); *Farmers Union Milk Marketing Co-op v. Yeutter*, 930 F.2d 466, 471-74 (6th Cir. 1991), and *Suntex Dairy v. Bergland*, 591 F.2d 1063, 1065-67 (5th Cir. 1979), all holding that milk producers (dairy farmers) do have a right to judicial review of milk marketing orders, with *United Dairymen of Arizona v. Veneman*, 279 F.3d 1160, 1165 (9th Cir. 2002), and *Pescosolido v. Block*, 765 F.2d 827, 832-33 (9th Cir. 1985), holding that they do not. The judge thought that this court had taken the latter position in *Uelman v. Freeman*, 388 F.2d 308 (7th Cir. 1967) (see also *United Milk Producers v. Benson*, 225 F.2d 527, 529 (D.C. Cir. 1955), a similar case), and he felt bound by that decision, which in addition he thought bolstered by the Supreme Court's ruling in *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), that consumers do not have standing to challenge milk market orders.

*Uelman* is not controlling. The Supreme Court had held in *Stark v. Wickard*, 321 U.S. 288 (1944), that even though the milk marketing law did not in so many words confer on producers a right to judicial review of milk marketing orders, they could challenge such an order if in issuing it the Agriculture Department had exceeded the authority delegated to it by Congress and in doing so had infringed a definite right of the producer, *id.* at 307-10, criteria not

satisfied in *Uelman*. The plaintiffs in our case seek judicial review not on the basis of the extrastatutory rule of *Stark*, 321 U.S. at 307-10, but on the basis of the Administrative Procedure Act, which confers a right to mount a judicial challenge to agency action on persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, unless the statute in question "preclude[s] judicial review." 5 U.S.C. § 701(a)(1). Section 702 certainly describes these plaintiffs, who are injured in their pocketbooks by having their access to the Mideast blended price, which is higher than the blended price in their region, curtailed. Moreover, dairy farmers, the plaintiffs in this case, are, as the Court noted in *Stark*, 321 U.S. at 305-06, the very group that the milk marketing law seeks to protect. "The right of judicial review is ordinarily inferred where congressional intent to protect the interests of the class of which the plaintiff is a member can be found; in such cases, unless members of the protected class may have judicial review the statutory objectives might not be realized." *Barlow v. Collins*, 397 U.S. 159, 167 (1970); see also *American Federation of Government Employees, Local 2119 v. Cohen*, 171 F.3d 460, 469 (7th Cir. 1999); *First National Bank & Trust Co. v. National Credit Union Administration*, 988 F.2d 1272, 1275 (D.C. Cir. 1993).

The Agriculture Department argues that the milk marketing law repeals so much of the APA as would otherwise entitle dairy farmers to challenge a milk marketing order that harmed them. The milk marketing law expressly authorizes judicial review of milk marketing orders at the behest of handlers, 7 U.S.C. § 608c(15), but is silent on the right of a dairy farmer (that is, a producer, rather than a purchaser from the producer) to get judicial review. The Department asks us to infer from this silence that Congress meant to preclude judicial review by farmers, thus bringing this case within 5 U.S.C. § 701(a)(1). But inferences

from congressional silence are treacherous; oversights
are common in the hurly-burly of congressional enact-
ment; omissions are not enactments; and even deliberate
omissions are often subject to alternative interpretations,
as here. Handlers are not indifferent to the price of milk,
since they are the purchasers of milk from the dairy farmers.
But as middlemen, able to pass on a portion, maybe a
very large portion, of any higher price to their custom-
ers—the milk distributors, cheese factories, and so forth—
they may be indifferent to many changes in milk market-
ing orders, including the one at issue in this case, which
basically transfers wealth from Mideast to Wisconsin
dairy farmers. No such indifference can attend the farmers
who have brought the present suit; every additional
cent they receive for their milk goes directly to their bottom
line. Congress may have thought it obvious that as the
intended beneficiaries of milk marketing orders, dairy
farmers could challenge those orders in court, but not
obvious that handlers could, and so it expressly author-
ized suits by them as well.

History supports this interpretation. What is now the
milk marketing law was originally a part of the first Agri-
cultural Adjustment Act, passed in 1933, 48 Stat. 31, and
that act contained no provision for judicial review of pric-
ing orders issued under it, including milk marketing or-
ders. The statutory provision authorizing handlers to
sue was added to the AAA in 1935 and was retained when
the Act's provisions dealing with milk marketing were
split off and made the subject of a separate statute, the
statute involved in this case, the Agricultural Marketing
Agreement Act of 1937. *Block v. Community Nutrition
Institute, supra*, 467 U.S. at 346. This was years before the
Administrative Procedure Act was enacted. After it was
enacted, with the provision quoted earlier (5 U.S.C. § 702)
that by its terms would have seemed to entitle milk pro-

ducers as persons aggrieved by adverse milk marketing orders to obtain judicial review, there was no urgent need for Congress to revisit the milk marketing law and add a provision expressly authorizing that review.

Now it is true that in denying standing to milk consumers, the Supreme Court in *Block* had emphasized that allowing them to challenge milk marketing orders in court would cause the administrative remedies that the milk marketing law had created to be bypassed; and the concern extends to producers (though not in every case, and specifically, as we'll see, not in this case). The provision entitling handlers to judicial review starts off by saying that "any handler subject to [a milk marketing order] may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law." 7 U.S.C. § 608c(15)(A). The handler can seek review of that ruling in federal district court. *Id.*, § 608c(15)(B). There is no similar provision regarding petitions for administrative review by consumers—or producers. So if permitted to sue, consumers or producers might raise in court objections to the milk marketing order that the regulators had not had a chance to consider. "Nowhere in the [milk marketing] Act is there an express provision for participation by consumers in any proceeding. In a complex scheme of this type, the omission of such a provision is sufficient reason to be-

lieve that Congress intended to foreclose consumer participation in the regulatory process." *Block v. Community Nutrition Institute, supra,* 467 U.S. at 347.

The implication is less that judicial review should be denied to all aggrieved persons except handlers than that aggrieved persons should be required to exhaust administrative remedies before suing. The distinction was not important in *Block.* Consumers' interests are aligned with handlers' interests, and handlers, who have to exhaust their administrative remedies as we have just seen, have express authority to sue. So there was little need to complicate the administrative scheme by allowing (more precisely, by imputing to Congress an intent to allow) consumers to sue as well. Cf. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745-47 (1977), denying indirect purchasers (generally consumers) the right to bring antitrust suits seeking damages from remote sellers since direct purchasers can do so. Milk producers' interests, however, tend to be antagonistic to handlers' interests, producers being the sellers and handlers the buyers.

All this is made clear in *Block.* "The structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized. Respondents [i.e., the consumers who had brought the suit in *Block*] would have us believe that, while Congress unequivocally directed handlers first to complain to the Secretary that the prices set by milk market orders are too high, it was nevertheless the legislative judgment that the same challenge, if advanced by consumers, does not require initial administrative scrutiny . . . . Allowing consumers to sue the Secretary [of Agriculture] would severely disrupt this complex and delicate administrative scheme. It would provide handlers with a convenient device for evading the statutory

requirement that they first exhaust their administrative remedies. A handler . . . would need only to find a consumer who is willing to join in or initiate an action in the district court. The consumer or consumer-handler could then raise precisely the same exceptions that the handler must raise administratively. Consumers or consumer-handlers could seek injunctions against the operation of market orders that 'impede, hinder, or delay' enforcement actions, even though such injunctions are expressly prohibited in proceedings properly instituted under 7 U.S.C. § 608c(15) [i.e., by handlers]." *Block v. Community Nutrition Institute, supra*, 467 U.S. at 347-48. Notice the distinction that the Court draws between consumers and producers, properly so since the stepping-on-the-heels-of-the-handlers concerns that it expresses about allowing consumers to sue do not arise when the suit is by a producer.

The reasoning of *Block*, transposed from consumer to producer suits, suggests that imposing a requirement of exhausting administrative remedies would be greatly preferable to abrogating the right to sue. Every federal court and agency has inherent authority (unless abrogated by Congress) to reexamine its decisions if asked to do so within a reasonable time, *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO, CLC, Local 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 847 (7th Cir. 1995); *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1018 (7th Cir. 1988); *Isle Royale Boaters Ass'n v. Norton*, 330 F.3d 777, 786 (6th Cir. 2003); *Dun & Bradstreet Corp. Foundation v. United States Postal Service*, 946 F.2d 189, 193-94 (2d Cir. 1991), including we assume the Agriculture Department; and so the producers could have complained to the Department about the loophole-closing amendment. But the courts do not have the power to require an agency to make the persons subject to its regulatory powers jump through procedural hoops not

found in its organic statute or implementing regulations, as a precondition to obtaining judicial review. That's what 5 U.S.C. § 704 says, and the Supreme Court explained in *Darby v. Cisneros*, 509 U.S. 137, 146-47 (1993), that adding those hoops would make it too difficult for aggrieved persons to determine when agency action was final so that they could seek judicial review. The milk marketing law authorizes only handlers to ask the Department for relief from a milk marketing order. We cannot impose a similar rule on producers.

But presumably the Department can by amending the procedures that it has promulgated for milk-marketing hearings. See 7 C.F.R. pt. 900; cf. 5 U.S.C. § 553(e); *Auer v. Robbins*, 519 U.S. 452, 459 (1997). "Except as otherwise expressly required by statute, agency action otherwise final is final for purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, *unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative*, for an appeal to superior agency authority." 5 U.S.C. § 704 (emphasis added). This provision, as the Court remarked in *Darby*, "by its very terms, has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute *or rule* clearly mandates." 509 U.S. at 146 (emphasis added). "Agencies may avoid the finality of an initial decision, first, by adopting a rule that an agency appeal be taken before judicial review is available, and, second, by providing that the initial decision would be 'inoperative' pending appeal. Otherwise, the initial decision becomes final and the aggrieved party is entitled to judicial review." *Id.* at 152.

The absence of a requirement that the producers exhaust their administrative remedies weakens the argument for allowing them to seek judicial review. For the

argument if accepted creates a risk of their bypassing the agency and raising objections that the agency might have responded to more effectively than in its brief in the reviewing court—but not in this case. And maybe not in any case, since as we have just seen the Agriculture Department can impose a requirement of exhaustion, and it ought not be allowed to use its failure to do so to block judicial review of its orders. But let us set that point to one side and focus narrowly on this case. Remember that the only complaint the plaintiffs are pressing in this appeal is that they didn't receive adequate notice of the relief contemplated by the Department; they didn't know what was at stake for them in the proceeding and therefore they didn't participate fully in it, though some of them, as the defendants stress, did participate to a greater or lesser extent. Although the Department is in a better position than we are to decide whether their objections to the amendment have sufficient merit to warrant reopening the rulemaking proceeding, they are not asking us to rule on those objections. They are asking us to decide the purely procedural question whether the Department gave them adequate notice. Requiring them to tender this issue first to the Department would be a waste of time.

The Department's final argument against allowing producers to sue is that many of them, dairy co-ops for example, are both producers and handlers (that is, these producers have cut out the middleman) and could sue in the latter capacity. But these hybrids have no quarrel *as handlers* with the order. If the Department nevertheless believes, as it seems to, that they could sue to protect their interests as producers, it is giving away the game; for there is no reason to confine the right to sue to producers adventitiously engaged in handling as well.

We conclude that producers can seek judicial review of milk marketing orders that pinch them, and so we can

proceed at last to the merits, which is to say to the issue of notice. The Administrative Procedure Act requires published notice of proposed rulemaking, 5 U.S.C. § 553(b), but does not specify how detailed the notice must be. We have said that "notice is adequate if it apprises interested parties of the issues to be addressed in the rulemaking proceeding with sufficient clarity and specificity to allow them to participate in the rulemaking in a meaningful and informed manner." *American Medical Ass'n v. United States*, 887 F.2d 760, 767 (7th Cir. 1987). But "while an agency must explain and justify its departures from a proposed rule, it is not straitjacketed into the approach initially suggested on pain of triggering a further round of notice-and-comment." *Id.* at 769. "The law does not require that every alteration in a proposed rule be reissued for notice and comment. If that were the case, an agency could 'learn from the comments on its proposals only at the peril of' subjecting itself to rulemaking without end." *First American Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000). The purpose of a rulemaking proceeding is not merely to vote up or down the specific proposals advanced before the proceeding begins, but to refine, modify, and supplement the proposals in the light of evidence and arguments presented in the course of the proceeding. If every modification is to require a further hearing at which that modification is set forth in the notice, agencies will be loath to modify initial proposals, and the rulemaking process will be degraded.

The notice that the Department issued, *Milk in the Mideast Marketing Area; Notice of Hearing on Proposed Amendments to Tentative Marketing Agreement and Order*, 66 Fed. Reg. 49571 (Sept. 28, 2001), stated: "A public hearing is being held to consider proposals that would amend certain pooling and related provisions of the Mideast order.

Proposals include . . . decreasing the amount of producer milk that can be diverted to nonpool plants for varying months of the year; and increasing the minimum amount of milk that a producer needs to deliver to pool plants in order to qualify as a producer and to be eligible to be pooled on the order . . . [and] eliminating a provision that currently permits a pool plant to have both a pool and a nonpool portion; [and] establishing a 'net shipment' provision for milk received at pool plants for determining pooling eligibility." Though this is gobbledygook to an outsider, insiders such as the plaintiffs would realize that the focus of the proceeding would be on their eligibility to be pooled with the Mideast producers (that is what being "pooled on the [Mideast] order" means).

What is true is that none of the proposals was identical to the amendment that the Department adopted at the end of the proceeding, namely the prohibition of paper pooling with distant plants. But paper pooling was one of the principal methods by which the plaintiffs got to pool with the Mideast producers, so that they had to assume that it would be one of the issues in the proceeding and a possible target for reform. They knew their aggressive inroads into the Mideast were controversial; they knew that in engaging in paper pooling with Mideast farmers they were exploiting the loophole created by the Department's abolition in 2000 of the price penalties for such pooling; they knew therefore that a curtailment of their access to the Mideast blended price was a likely outcome of a rulemaking proceeding expressly concerned with the criteria for eligibility for pooling with the Mideast producers. They knew enough to know that if they wanted to protect their participation in the Mideast pool they would have to participate in the rulemaking proceeding. Their choice not to do so cannot be attributed to a lack of notice.

The judgment dismissing the suit is modified to base dismissal on the merits rather than on lack of jurisdiction, and as so modified is affirmed.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*