BROWN, Circuit Judge,
with whom Chief Judge SENTELLE joins, concurring:
I agree fully with the court’s opinion. Given the long-standing precedents in this area no other result is possible. Our precedents forced the Hettingas to make a difficult legal argument. No doubt they would have preferred a simpler one — that the operation and production of their enterprises had been impermissibly collectivized — but a long line of constitutional adjudication precluded that claim.
The Hettingas’ sense of ill-usage is understandable. So is their consternation at being confronted with the gap between the rhetoric of free markets and the reality of ubiquitous regulation. The Hettingas’ collision with the MREA — the latest iteration of the venerable AMAA — reveals an ugly truth: America’s cowboy capitalism was long ago disarmed by a democratic process increasingly dominated by powerful groups with economic interests antithetical to competitors and consumers. And the courts, from which the victims of burdensome regulation sought protection, have been negotiating the terms of surrender since the 1930s.
First the Supreme Court allowed state and local jurisdictions to regulate property, pursuant to their police powers, in the public interest, and to “adopt whatever economic policy may reasonably be deemed to promote public welfare.” Nebbia v. New York, 291 U.S. 502, 516, 54 S.Ct. 505, 78 L.Ed. 940 (1934). Then the Court relegated economic liberty to a lower echelon of constitutional protection than personal or political liberty, according restrictions on property rights only minimal *481 review. United States v. Carotene Products Co., 304 U.S. 144, 152-53, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). Finally, the Court abdicated its constitutional duty to protect economic rights completely, acknowledging that the only recourse for aggrieved property owners lies in the “democratic process.” Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). “The Constitution,” the Court said, “presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.” Id.
As the dissent predicted in Nebbia, the judiciary’s refusal to consider the wisdom of legislative acts — at least to inquire whether its purpose and the means proposed are “within legislative power”— would lead to only one result: “[RJights guaranteed by the Constitution [would] exist only so long as supposed public interest does not require their extinction.” 291 U.S. at 523, 54 S.Ct. 505. In short order that baleful prophecy received the court’s imprimatur. In Carotene Products (yet another case involving protectionist legislation), the court ratified minimalist review of economic regulations, holding that a rational basis for economic legislation would be presumed and more searching inquiry would be reserved for intrusions on political rights. 304 U.S. at 153 n. 4, 58 S.Ct. 778.
Thus the Supreme Court decided economic liberty was not a fundamental constitutional right, and decreed economic legislation must be upheld against an equal protection challenge “if there is any reasonably conceivable state of facts that could provide a rational basis” for it. FCC v. Beach Commc’ns, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). See also Pac. States Box & Basket Co. v. White, 296 U.S. 176, 185-86, 56 S.Ct. 159, 80 L.Ed. 138 (1935); Steffan v. Perry, 41 F.3d 677, 684-85 (D.C.Cir.1994) (en banc).
This standard is particularly troubling in light of the pessimistic view of human nature that animated the Framing of the Constitution — a worldview that the American polity and its political handmaidens have, unfortunately, shown to be largely justified. See James Madison, Notes of Debates in the Federal Convention of 1787, at 39, 42 (W.W. Norton & Co. 1987). Moreover, what the Framers theorized about the destructive potential of factions (now known as special or group interests), experience has also shown to be true. The Federalist No. 10, at 78, 81 (James Madison) (Clinton Rossiter ed., 1961). The judiciary has worried incessantly about the “countermajoritarian difficulty” when interpreting the Constitution. But the better view may be that the Constitution created the countermajoritarian difficulty in order to thwart more potent threats to the Republic: the political temptation to exploit the public appetite for other people’s money — either by buying consent with broad-based entitlements or selling subsidies, licensing restrictions, tariffs, or price fixing regimes to benefit narrow special interests.
The Hettingas believe they are the victims of just such shenanigans. Compl. ¶¶ 40-45. And press accounts during the height of the controversy support the claim. See Dan Morgan, Sarah Cohen, & Gilbert M. Gaul, “Dairy Industry Crushed Innovator Who Bested Price-Control System,” Wash. Post, Dec. 10, 2006, available at http://www.washingtonpost.com/wpdyn/ content/article/2006/12/09/AR 2006120900925.html. The Washington Post described Hein Hettinga as an American success story. He emigrated to the U.S. *482 after World War II and started as a hired hand. By 1990, Hettinga owned half a dozen dairies and decided to build his own bottling business. A Costco vice president showed reporters copies of an e-mail he sent to Senator Reid during the legislative debate, explaining that Southern California purchasers of milk were the victims of “a brazen case of price gouging and profiteering by the strongest, largest market suppliers,” who turned a deaf ear to the company’s call for lower prices. Hein Hettinga changed all that. His arrangement with Costco “lowered the average price of milk by 20 cents a gallon overnight” until two senators, .one from each party, pushed through the milk legislation at issue in this case.
Very little seems to have changed since the Supreme Court’s initial confrontation with the regulation of milk pricing in Nebbia. The state of New York, responding to falling prices caused by the Great Depression, created a Milk Control Board, which proposed to remedy weak demand by establishing a minimum price for milk, and making sale of milk at any lower price a crime. 291 U.S. at 515, 519, 54 S.Ct. 505. Leo Nebbia sold two quarts of milk and a five-cent loaf of bread for eighteen cents, and was convicted of violating the board’s order. Id. at 515, 54 S.Ct. 505.
Even Justice McReynolds saw the irony. The law, he said, “impose[d] direct and arbitrary burdens upon those already seriously impoverished” to give special benefits to others. Id. at 557, 54 S.Ct. 505. “To him with less than 9 cents it says: You cannot procure a quart of milk from the grocer although he is anxious to accept what you can pay and the demands of your household are urgent! A superabundance; but no child can purchase from a willing storekeeper below the figure appointed by three men at headquarters!” Id. at 557-58, 54 S.Ct. 505.
To be sure, the economic climate in which the New York legislature enacted the law at issue in Nebbia was truly dire, but 78 years later, the same tired trope about “disorderly market conduct” is still extant. The Hettingas built their business on an exemption — one that was profitable for them and beneficial for consumers. The government acknowledged that the decision to eliminate the exemption was based on evidence that large producer-handlers were obtaining a “decisive competitive advantage” over fully-regulated handlers, Appellees’ Br. at 7, and were causing a measurable and “significant ]” decrease in the blend prices being paid to regulated handlers. See 70 Fed.Reg. 74,-166, 74,186 (Dec. 14, 2005). As another court has noted, federal regulation of milk pricing “is premised on dissatisfaction with the results of competition.” Alto Dairy v. Veneman, 336 F.3d 560, 562 (7th Cir.2003). “[M]ilk price discrimination is intended to redistribute wealth from consumers to producers of milk.” Id. Once again, the government has thwarted the free market, and ultimately hurt consumers, to protect the economic interests of a powerful faction. Neither the legislators nor the lobbyists broke any positive laws to accomplish this result. It just seems like a crime.
The judiciary justifies its reluctance to intervene by claiming incompetence — apparently, judges lack the acumen to recognize corruption, self-interest, or arbitrariness in the economic realm — or deferring to the majoritarian imperative. But see The Federalist No. 78, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The practical effect of rational basis review of economic regulation is the absence of any check on the group interests that all too often control the democratic process. It allows the legislature free rein to subjugate the common good and individual liber *483 ty to the electoral calculus of politicians, the whim of majorities, or the self-interest of factions. See Randy E. Barnett, Restoring the Lost Constitution: The Presumption of Liberty 260 (2004).
The hope of correction at the ballot box is purely illusory. See generally Ilya So-min, Political Ignorance and the CounterMajoritarian Difficulty: A New Perspective on the Central Obsession of Constitutional Theory, 89 Iowa L.Rev. 1287 (2004). In an earlier century, H.L. Mencken offered a blunt assessment of that option: “[GJovernment is a broker in pillage, and every election is a sort of advance auction sale of stolen goods.” On Politics: A Carnival of Buncombe 331 (1996). And, as the Hettingas can attest, it’s no good hoping the process will heal itself. Civil society, “once it grows addicted to redistribution, changes its character and comes to require the state to ‘feed its habit.’ ” Anthony De Jasay, The State 226 (1998). The difficulty of assessing net benefits and burdens makes the idea of public choice oxymoronic. See id. at 248. Rational basis review means property is at the mercy of the pillagers. The constitutional guarantee of liberty deserves more respect — a lot more.