In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-4304

EBY-BROWN COMPANY, LLC,

*Plaintiff-Appellant,*

*v.*

WISCONSIN DEPARTMENT OF AGRICULTURE, TRADE
AND CONSUMER PROTECTION AND ITS SECRETARY,
JAMES HARSDORF,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:00-C-0718-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED MAY 15, 2002—DECIDED JULY 8, 2002

Before FLAUM, *Chief Judge,* and BAUER, and RIPPLE,
*Circuit Judges.*

FLAUM, *Chief Judge.* The appellant, Eby-Brown Company
LLC ("Eby-Brown"), a distributor of tobacco products in the
state of Wisconsin, appeals the district court's grant of
summary judgment against it. According to Eby-Brown, a
Wisconsin statute that prohibits unfair pricing violates the
equal protection, due process, and commerce clauses of the
Constitution. For the reasons stated below, we affirm the
district court's decision.

## I.  BACKGROUND

Eby-Brown is a wholesale distributor of tobacco products, food items and sundries. It sells its products to individual retailers, such as gas stations, convenience stores and larger retail establishments. Eby-Brown claims that tobacco products form an important part of its business with these entities, such that if Eby-Brown's tobacco prices are more competitive than other wholesale distributors, it will gain the lion's share of the food item and sundry business.

Wisconsin statutes recognize two distinct types of cigarette wholesalers: permit holders and jobbers.[1] A permit holder is licensed to affix revenue stamps upon cigarette packages. Wis. Stat. § 139.30(3). Jobbers are not permitted to affix such stamps and must instead purchase stamped products from permit holders. Wis. Stat. § 139.30(6). Eby-Brown is a permit holder. The state of Wisconsin also makes a distinction between "retailers" and "multiple retailers." Under statutory definitions, a "retailer" is any person who acquires stamped cigarettes with the intent to sell them to consumers. A "multiple-retailer" is any person who acquires stamped cigarettes and "stores . . . and sells them to consumers through 10 or more retail outlets which he or she owns and operates within or without this state." Wis. Stat. § 139.30(8). Eby-Brown markets cigarettes to both "retailers" and "multi-retailers."

Eby-Brown, and indeed all wholesalers doing business in Wisconsin, are subject to that state's Unfair Sales Act ("Act"). Wis. Stat. § 100.30. The stated policy behind the Act is to disallow "[t]he practice of selling certain items of merchandise below cost in order to attract patronage . . ." because such conduct "diverts business from dealers who maintain a fair price policy." Wis. Stat. § 100.30(1). In es-

---

[1] Permit holders are also referred to as licensed cigarette distributors or wholesalers.

sence, the Act prohibits retailers and wholesalers from selling products below the minimum price defined by the statute, which the Act refers to as the "the cost to wholesaler." In determining the minimum price at which they may sell products, wholesalers may not deduct any rebates given to them by manufacturers for the payments they made in cash[2] or any other manufacturer's discount.

The Act also creates distinctions between general wholesalers and those entities that sell tobacco (and in certain circumstances liquor and gasoline). For example, licensed cigarette wholesalers, like Eby-Brown, who are permitted to affix stamps to cigarette packages, are not permitted to deduct any trade discount from their "cost to wholesaler" figure. Wis. Stat. § 100.30(2)(c)1.b. Other wholesalers, including those wholesalers of tobacco that are not authorized to affix revenue stamps, are permitted to deduct trade discounts from their "cost to wholesaler" figure.[3] Additionally, *all* tobacco wholesalers must include a mark-up for the "cost[s] of doing business." *Id.*[4] Generally, this mark-up amounts to three percent of the total costs to the manufacturer. Wholesalers of other products are not obligated to include such a mark-up in tabulating their minimum prices.

---

[2] For example, if Eby-Brown was required to pay $100 for a quantity of merchandise and received a $15 discount for having made its payment in cash, its statutorily defined "cost to wholesaler" remains $100.

[3] A trade discount is "calculated on the basis of the quantity or dollar amount of merchandise actually purchased or sold" and "is not a customary discount for cash." Wis. Admin. Code. § ATCP 105.007(3)(b). A trade discount essentially operates as a way for manufacturers to offer a reduced price for higher volume or more successful wholesalers.

[4] Wholesalers of liquor and gasoline must also include a mark-up for the "cost[s] of doing business" when they calculate their statutory minimum price.

For several years prior to the commencement of this litigation, Eby-Brown participated in a program with the manufacturers of tobacco products whereby it was required to pay for the items it received through an electronic fund transfer system. For its use of this electronic transfer system, Eby-Brown, as well as the other wholesalers who participated in the program, was given across-the-board discounts off the invoice price ranging from 2.0% to 3.5%. In selling its products to retailers in Wisconsin, Eby-Brown sought to incorporate this discount (as well as others) when it tabulated its statutorily permissible "cost to wholesaler." Since January of 1994, Eby-Brown has received over one hundred complaints that it was selling tobacco at a statutorily proscribed cost. Several of these complaints were referred to the appropriate district attorneys for prosecution; while many others are still being investigated.

As a result of these complaints, Eby-Brown filed suit against the state of Wisconsin seeking a declaration that the Act violates its rights to equal protection and substantive due process. Eby-Brown further sought to enjoin the state of Wisconsin from the enforcement of the Act. According to Eby-Brown, the Act violates equal protection because licensed cigarette wholesalers, and only licensed cigarette wholesalers, are forbidden from deducting trade discounts from their "cost to wholesaler" figure. Eby-Brown claims an additional breach of equal protection because the Act requires only wholesalers of tobacco, liquor and gasoline to add a cost of doing business mark-up to their statutorily defined "cost to wholesaler." Eby-Brown also advanced several substantive due process claims. Lastly, Eby-Brown alleged that the Act impermissibly interfered with interstate commerce.

After initial proceedings and discovery, both parties filed motions for summary judgment. The district court ruled in favor of the state of Wisconsin. According to the district court, a rational basis existed for the state's enactment (and

application) of the Act. Therefore, the district court found that the Act did not violate Eby-Brown's right to equal protection or substantive due process and that it did not unnecessarily burden interstate commerce.

Eby-Brown now appeals the district court's decision.

## II. DISCUSSION

In reviewing the district court's grant of summary judgment, we exercise *de novo* review, viewing all the facts and inferences in a light most favorable to the nonmoving party. *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 731 (7th Cir. 2001).

### A. *Equal Protection and Substantive Due Process Claims*

Eby-Brown argues that several provisions of the Act violate both its right to equal protection and its rights to substantive due process. However, many of these arguments are more properly considered claims under the equal protection clause alone. When "a particular amendment [like the equal protection clause] 'provides an explicit textual source of constitutional protection' against a particular source of government behavior, 'that amendment and not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The bulk of the allegations set forth by Eby-Brown seek redress for the alleged unequal treatment it received as a licensed wholesaler of tobacco. We analyze these claims under the equal protection clause. Eby-Brown's remaining substantive due process allegations shall be addressed separately below.

In any event, the scrutiny that we exercise in examining Eby-Brown's allegations (under either the equal protection

or substantive due process clauses) remains the same. When we review the constitutionality of state legislation, we must ask whether the act in question impacts a fundamental right or targets a suspect class. When no suspect class or fundamental right is involved, we employ a rational basis test to determine whether the legislative act is constitutional. *See Heller v. Doe*, 509 U.S. 312, 319 (1993). In employing this test, we will uphold the legislative enactment (or classification) so long as it "bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). This means that we will not "strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488 (1955). Absent some antipathy directed at a particular group or an enactment that encumbers a fundamental right, improvident decisions by the political branches of government should be rectified through the democratic process and not the courts. *See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993).

### 1. Equal Protection

Eby-Brown has conceded that it is not a member of a suspect class. Therefore, in analyzing its equal protection claims, we employ the highly deferential rational basis test articulated above. Under that standard, we find that the state of Wisconsin acted rationally and that the relevant portions of the Act should be upheld.

Eby-Brown contends that the Act violates equal protection because licensed wholesalers of tobacco are forbidden from deducting "trade discounts" when they calculate their "cost to wholesaler," whereas all other wholesalers (including unlicenced tobacco wholesalers) are permitted to deduct such discounts in calculating their minimum costs. While

one may question whether the distinctions made by the Wisconsin legislature are the most desirable, a "governmental action [satisfies] the rational basis test if a sound reason may be hypothesized" for the classification. *Northside Sanitary Landfill v. Indianapolis*, 902 F.2d 521, 522 (7th Cir. 1990). The state of Wisconsin permissibly could have concluded that licensed wholesalers of tobacco, as opposed to wholesalers of other products, should not be allowed to deduct trade discounts when they determine their "cost[s] to wholesaler." *Compare*, Wis. Stat. § 100.30(2)(c)1.b. *with Wis. Stat.* § 100.30(2)(c)2. Given the relatively small profit margins that exist for wholesalers of tobacco (resulting in an extremely competitive sales price offered to retailers), the state of Wisconsin could have concluded that trade discounts constitute a way for predatory wholesalers in the industry to artificially depress their prices for short periods to steer business away from other wholesalers. Similarly, the distinction that the state has drawn between licensed tobacco wholesalers, who are not allowed to deduct trade discounts when they determine their "cost to wholesaler," and unlicenced tobacco wholesalers ("jobbers") seems rational. Licensed wholesalers have primary contact with cigarette manufacturers. They could conceivably use trade discounts to temporarily deflate prices and increase demand for the cigarettes that they (and not the smaller "jobbers") sell to retailers. Jobbers are not authorized to affix stamps to cigarette packages and do not generally purchase cigarettes directly from the manufacturers. This is because "jobbers" can only sell cigarettes that are affixed with revenue stamps. As a result, jobbers generally must acquire cigarettes from licensed wholesalers before selling them to retailers. Therefore, jobbers almost uniformly lack the means to use trade discounts to artificially deflate their "cost to wholesaler."

Eby-Brown's other claims of unequal treatment must also fail in the face of the deferential rational basis test. For

example, Eby-Brown claims that the "cost of doing business" mark-up, which wholesalers of gasoline, tobacco, and alcohol must include in calculating their minimum prices, violates equal protection. However, the state of Wisconsin could have rationally drawn a distinction between wholesalers of these products and other vendors. For example, tobacco, alcohol and gasoline are products that are heavily regulated, costly to insure, and generally considered dangerous. By requiring wholesalers of these products to include a "cost of doing business" mark-up, the state could be attempting to discourage these individuals from cutting corners when it comes to warehousing and insuring their products. This hypothetical rationale, in and of itself, would support the constitutionality of this portion of the Act.

### 2. *Substantive Due Process*

Eby-Brown has also conceded that its remaining substantive due process claims should be examined under the deferential rational basis test. When we employ that level of scrutiny, we find that these claims must also fail.

Eby-Brown asserts that the Act, in prohibiting all wholesalers from deducting manufacturers' discounts from "the cost to wholesaler" figure, operates in an arbitrary and irrational matter. Similarly, Eby-Brown contends that the state of Wisconsin's refusal to allow wholesalers to deduct rebates that they receive from manufacturers for participating in electronic payment programs from the "cost to wholesaler" figure, violates substantive due process.

With respect to both measures, Eby-Brown claims that they transform Act from a piece of legislation aimed at curbing unfair and predatory pricing, to a price fixing mechanism. The truth of this assertion matters little—as the state of Wisconsin could have had a rational objective in taking the above course. With respect to the exclusion of manufacturers' discounts, the state of Wisconsin could have

concluded that such discounts can be employed to artificially deflate prices, allowing certain wholesalers to gain a competitive advantage over others. In addition, the exclusion of manufacturers' discounts from the "cost to wholesaler" calculus might promote a more efficient administration of the Act. Manufacturers' discounts can take many forms and may be tied to many variables (*e.g.*, quantity of goods sold over a certain period of time by a particular wholesaler). The complex nature of such discounts might make it difficult for the relevant enforcement agencies to determine what was the *actual* minimum price paid by the wholesalers for certain goods.

With respect to electronic transfers, the state of Wisconsin could have determined that discounts premised upon such payment methods operate as discounts for "cash payment." Under the Act, wholesalers are prohibited from deducting discounts for "cash payments" from the "cost to wholesaler" figure. The primary purpose of excluding such discounts is that a cash discount is generally considered to be a reward for prompt payment (and therefore, part of the parties' financing terms) and not a reduction in price. *See E&H Wholesale, Inc. v. Glaser Bros.*, 158 Cal. App.3d 728, 734-35 (Ct. App. 1984); *see also American Heritage Dictionary* 288 (4th ed. 2000) ("cash discount" defined as "reduction in the price of an item for sale allowed if payment is made in a stipulated period"). As with cash payments, manufacturers receive electronic transfers instantly and may use the proceeds therefrom without hindrance. Based solely upon these cogent similarities, the state of Wisconsin rationally could have found that wholesalers should not be permitted to deduct discounts for what are, in its opinion, merely part of its financing terms.

### B. Commerce Clause

Finally, Eby-Brown contends that the Act violates the commerce clause in that it unfairly burdens interstate com-

merce. The commerce clause of the Constitution delegates to Congress the power regulate commerce among the states. U.S. Const. Art I, § 8. This "affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the states to enact legislation affecting interstate commerce." *Healy v. The Beer Institute*, 491 U.S. 324, 326 n. 1 (1989). The so-called "dormant commerce clause" prohibits the various states from discriminating against or burdening items in the interstate stream of commerce. *See Oregon Waste Sys. v. Dept. of Envtl. Quality*, 511 U.S. 93, 98 (1994). In examining whether a state enactment violates the "dormant" aspect of the commerce clause, courts must first determine if the regulation provides "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* at 99. Non-discriminatory state laws that have only an incidental effect upon interstate commerce will be considered valid unless "the burden imposed on such commerce is clearly excessive in relation to putative local benefits." *Id.*

First and foremost, the Act applies to both in-state and out-of-state cigarette wholesalers that do business in Wisconsin. It does not attempt to tie the price wholesalers are permitted to charge in Wisconsin with out-of-state prices. *See Healy*, 491 U.S. 324 (state regulation found invalid when it required out-of-state shippers to affirm that their prices were no higher than prices posted in neighboring states). Furthermore, the Act does not excessively burden interstate commerce. Indeed, Eby-Brown's only argument in this regard is that the Act has affected the way in which it does business as a national chain of stores. The fact that doing business in Wisconsin has become more difficult for Eby-Brown does not mean that the Act violates the principles of interstate commerce. Eby-Brown has failed to demonstrate either prong of the relevant test: that the Act discriminates against out-of-state interests or excessively

burdens interstate commerce. Accordingly, we find that there has been no commerce clause violation.

### III. CONCLUSION

For the foregoing reasons, we find that the Wisconsin Unfair Sales Act does not violate the Constitution and we therefore AFFIRM the decision of the district court.

A true Copy:

       Teste:

                          _____
                          *Clerk of the United States Court of*
                             *Appeals for the Seventh Circuit*