# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-2308 & 03-2661

LAMERS DAIRY INCORPORATED,

*Plaintiff-Appellant,*

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,

*Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 890—**William C. Griesbach**, *Judge.*

_____

ARGUED FEBRUARY 10, 2004—DECIDED AUGUST 13, 2004

_____


Before RIPPLE, ROVNER and DIANE P. WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Lamers Dairy ("Lamers") sought an exemption from Milk Marketing Order No. 30, promulgated under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq. After the Secretary of the United States Department of Agriculture ("the USDA") denied the petition in a final administrative order, Lamers sought review in the district court. The USDA counterclaimed for enforcement of the Secretary's decision and for a judgment against Lamers in an amount equal to the unpaid monetary assessments due under the terms of the marketing order.

The district court granted summary judgment to the USDA on Lamers' complaint and on the USDA's counterclaim. It ordered further proceedings on the amount due. Subsequently, the district court denied a motion for reconsideration by Lamers and entered an amended judgment awarding the Government $850,931.26. Lamers appeals. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Lamers Dairy, a Wisconsin family-operated dairy, has as its principal business the handling and packaging of fluid milk. In this appeal, Lamers challenges aspects of the federal milk-marketing regulatory scheme. To understand the nature of Lamers' challenges, we must discuss briefly the dairy industry and the regulatory and market forces governing it.[1]

### 1. The Dairy Industry

In the dairy industry, dairy farmers, also referred to as "producers," produce and sell raw milk to "handlers." Handlers, in turn, prepare the milk product for resale to

---

[1] For additional background discussions, upon which this opinion has relied substantially, see *Zuber v. Allen*, 396 U.S. 168, 172-74 (1969); *Alto Dairy v. Veneman*, 336 F.3d 560, 562 (7th Cir. 2003); *Stew Leonard's v. Glickman*, 199 F.R.D. 48, 49-50 (D. Conn. 2001); and Alden C. Manchester & Don P. Blayney, *Milk Pricing in the United States*, Market & Trade Economics Div., Dep't of Agric., Agric. Info. Bull. No. 761 (Feb. 2001).

consumers or serve as intermediaries to those who do. Consumer dairy products, such as fluid milk beverages, ice cream and cheese, can all be produced from "Grade A" or "fluid grade" raw milk.[2] In the consumer market, however, milk beverages generally command a higher price than non-fluid products, which are known also as "manufactured dairy products." For this reason, the market into which dairy farmers sell their product more highly values (and pays a premium price for) Grade A milk ultimately used to produce beverage milk. This market premium based on end use creates an incentive among producers to divert their Grade A product to fluid milk handlers.[3] Were this incen-

---

[2] Grade B milk, on the other hand, which is subject to slightly less stringent sanitary standards, cannot be used to produce fluid milk beverages. In 1999, only about three percent of milk marketed failed to meet Grade A standards. *See* Manchester & Blayney, *supra* note 1, at 2.

[3] Prior to refrigeration, not all producers could pursue these premium prices. We have discussed previously the change to the market precipitated by refrigeration:

If milk were perishable, as it was in the days before refrigerated storage and transportation, dairy farmers serving urban markets (where milk is more likely to be consumed in fluid form than made into cheese or butter) would get higher prices for their output than dairy farmers remote from cities, who being unable to ship their milk a long distance would perforce sell most of it to manufacturers of cheese and other dairy products. But when refrigerated storage and transportation arrived on the scene, it became feasible for the remote dairy farmers—Wisconsin dairy farmers, for example—to ship milk to cities in other states, pushing down the price of fluid milk there and so hurting the dairy farmers who were

(continued...)

tive not controlled, lower market prices would result, harming milk production revenues.[4]

The dairy industry also is characterized by daily and seasonal fluctuations in supply and demand. Consumer demand fluctuates significantly on a daily basis, primarily due to consumer buying patterns; milk production, on the other hand, is relatively constant on a daily basis. Conversely, milk production varies seasonally based on the animals' nutritional health. In fall and winter months, less milk is produced, but in spring and summer months, more milk is produced. To meet consumer demand in the winter, producers must maintain large herds; these same herds over-produce in the summer. Given milk's perishable quality, the supply must go to market at least every other day. Historically, handlers were thus able to obtain summer supplies at bargain prices.

## 2. The Regulatory Scheme

In the wake of the Great Depression, in an attempt to address these unique industry characteristics, Congress enacted various provisions governing the dairy industry as part of the Agricultural Marketing Agreement Act of 1937 ("the AMAA"). A driving purpose of the AMAA was "to remove ruinous and self-defeating competition among the producers and permit all farmers to share the benefits of

---

[3] (...continued)
    located near those cities.

*Alto Dairy*, 336 F.3d at 562. This change in the competitive environment provided an impetus for regulation. *See id.* at 562-63.

[4] *See Alto Dairy*, 336 F.3d at 563 ("Such a diversion, what economists call 'arbitrage,' would undermine and, if uncontrolled, . . . reduce the incomes of dairy farmers as a group.").

fluid milk profits according to the value of goods produced and services rendered." *Zuber v. Allen*, 396 U.S. 168, 180-81 (1969). The AMAA, as amended, thus ensures that producers receive a uniform minimum price for their product, regardless of the end use to which it is put.

To accomplish this objective, the statute contains several mechanisms. First, it authorizes the Secretary to classify milk according to its end use and to establish minimum prices for each end-use classification. *See* 7 U.S.C. § 608c(5)(A). Second, it authorizes the Secretary to establish a uniform minimum price, termed the "blend price," based on a weighted average of all units of production of classes of milk sold to handlers associated with a marketing area. *See id.* Third, it requires handlers to pay producers the blend price, regardless of the end use to which the milk will be put. *See id.* § 608c(5)(B). Fourth, it authorizes a method for adjustments in payments among handlers so that the final amount paid by each handler equals the value of the milk that handler has purchased, according to the minimum prices established. *See id.* § 608c(5)(C). Overall, the provisions attempt to promote orderly milk-marketing by maintaining minimum prices for producers and limiting the competitive effects of excess supply of Grade A milk.

Although it protects producers, the AMAA regulates handlers only. Pursuant to the AMAA directives, the Secretary has classified milk into the following classes of utilization: Class I milk includes fluid milk processed and bottled as a beverage; Class II milk includes soft milk products such as cottage cheese, sour cream, yogurt and ice cream; Class III includes hard cheese and cream cheese; and Class IV includes raw milk used for butter and dry milk powder. As directed by the AMAA, the Secretary has established a uniform pricing scheme for each of these classes of milk, as

well as the average blend price.[5] Handlers governed by milk-marketing orders must pay producers this uniform blend price. The process of blending the prices of the different classes of milk on a monthly basis has come to be known as "pooling."

This uniform minimum pricing is intended to reduce the incentive producers would have to divert all fluid milk to Class I handlers and, literally, to flood that market. As the system operates, dairy producers within a marketing area receive the guaranteed uniform blend price for their milk, regardless of the end use to which it is put. Because the uniform price is a weighted average, some handlers pay producers less for their milk than its market worth while other handlers pay more. Handlers who pay less to producers must make compensating payments into the producer settlement fund while handlers who pay more to producers may withdraw compensating payments from the fund.[6] Thus, within the regulatory scheme, handlers ultimately pay an amount equal to the utilization value of the milk they

---

[5]  The minimum prices are derived from regulatory formulas, the exact intricacies of which are not relevant here. Speaking generally, Class III and Class IV prices are derived by surveying the retail price of products such as cheese and butter and then factoring out certain manufacturing costs. Class I prices are computed by adding appropriate location differentials to Class III and IV prices. *See* 7 C.F.R. § 1000.50. Because of this pricing system, it is sometimes said that Class III and IV handlers receive "make allowances" based on their manufacturing costs.

[6]  Compensating payments to and from the settlement fund are actually determined by more complicated formulas that account for the total value of the handler's milk utilization as well as various credits and adjustments for transportation, assembly and plant location.

purchase.[7] This simplified example of the regulatory scheme by the district court for the District of Connecticut is helpful:

> Suppose Handler A purchases 100 units of Class I (fluid) milk from Producer A at the minimum value of $3.00 per unit. Assume further that Handler B purchases 100 units of Class II (soft milk products) milk from Producer B at the minimum value of $2.00 per unit, and that Handler C purchases 100 units of Class III (hard milk products) milk from Producer C at $1.00 per unit. Assuming that this constitutes the entire milk market for a regulatory district, during this period the total price paid for milk is $600.00, making the average price per unit of milk $2.00. Thus, under the regulatory scheme, Producers A, B, and C all receive $200.00 for the milk they supplied, irrespective of the use to which it was put. However, Handler A must, in addition to the $200.00 that it must tender to Producer A, pay $100.00 into the settlement fund because the value of the milk it purchased exceeded the regulatory average price. Along the same vein, Handler C will receive $100.00 from the settlement fund because it will pay Producer C more than the milk it received was worth.

*Stew Leonard's v. Glickman*, 199 F.R.D. 48, 50 (D. Conn. 2001). The system of compensating payments into and out of the settlement fund thereby fulfills the AMAA requirement that

---

[7] Outside the regulatory system, economic realities may require some handlers to pay out-of-pocket premiums to producers, over and above the uniform blend price, in order to acquire their milk supply. These out-of-pocket premiums are not taken into consideration in the calculation of amounts owed to the settlement fund. *See* Manchester & Blayney, *supra* note 1, at 7 ("The prices set are minimums—market conditions can and often do lead to prices higher than the minimums.").

"the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed." 7 U.S.C. § 608c(5)(C).

The country is divided into regional milk-marketing areas, which are governed by different marketing orders. Milk Marketing Order No. 30 governs the Upper Midwest marketing area, including portions of Illinois, Iowa, Michigan, Minnesota, North Dakota, South Dakota and Wisconsin. As a Wisconsin dairy that bottles milk for fluid consumption, Lamers is subject to regulation under Milk Marketing Order No. 30 as a Class I handler.

### 3. Price Inversions

As discussed, Class I prices are generally higher than Class III prices. Thus, the blend price usually falls above the Class III price, and Class III handlers typically are entitled to withdraw compensating payments from the settlement fund after paying producers the blend price. However, occasionally, periods of "price inversion" occur,[8] in which

---

[8] The record in this case does not contain documentation of any periods of price inversion. However, throughout the litigation of this case, the USDA has addressed arguments regarding this occasional market occurrence. Furthermore, the Secretary of the USDA has issued statements recognizing the disruption to the regulatory scheme caused by price inversion. *See* Milk in the New England and Other Marketing Areas, Dep't of Agric., 64 Fed. Reg. 16,026, 16,102 (Apr. 2, 1999) ("The first problem is readily evident in class price relationships during the latter part of 1998. The frequent occurrence of price inversions during that period indicates that some alteration to both the proposed and current methods of computing and announcing Class I prices may be
(continued...)

Class III prices exceed Class I prices. Price inversions occur in part because of differences in how and when classes of milk are priced. Class I milk prices are set prospectively while Class III and IV prices are set retrospectively, based on actual market prices during the pertinent time period. The USDA has explained:

> Class price inversion occurs when a markets's [sic] regulated price for milk used in manufacturing exceeds the Class I (fluid) milk price in a given month, and causes serious competitive inequities among dairy farmers and regulated handlers. Advanced pricing of Class I milk actually causes this situation when manufactured product prices are increasing rapidly.

Milk in the New England and Other Marketing Areas, Dep't of Agric., 64 Fed. Reg. 16,026, 16,102 (Apr. 2, 1999). Thus, price inversions occur during times of increased demand for manufactured products, primarily cheese.

Under Order No. 30, Class III handlers are not required to participate in the regulatory pooling. They may *either* join the pool or remain outside the minimum price structure. (This is true to some extent under other milk-marketing orders as well.) When Class III handlers withdraw from the pool, or "de-pool," they are not obligated to make compensating payments to the settlement fund. During times of price inversion, then, Class III handlers have an incentive to withdraw from the pool. The USDA has explained the effect of price inversions on the dairy industry:

---

[8] (...continued)
necessary."). This court may take judicial notice of reports of administrative bodies, *see Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998), and it is therefore appropriate for this court to consider the reality of this occasional market occurrence.

> In the past when price inversions have occurred, the industry has contended with them by taking a loss on the milk that had to be pooled because of commitments to the Class I market, and by choosing not to pool large volumes of milk that normally would have been associated with Federal milk order pools. When . . . [price inversions occur], it places fluid milk processors and dairy farmers or cooperatives who service the Class I market at a competitive disadvantage relative to those who service the manufacturing milk market.

> Milk used in Class I in Federal order markets must be pooled, but milk for manufacturing is pooled voluntarily and will not be pooled if the returns from manufacturing exceed the blend price of the marketwide pool. Thus, an inequitable situation has developed where milk for manufacturing is pooled only when associating it with a marketwide pool increases returns.

*Id.* When producers prefer to sell outside the pool due to higher manufacturing returns, Class I handlers may have to pay out-of-pocket premiums to attract their supply.

Thus, during times of price inversion, Class III handlers who de-pool may pay *less than* the Class III price. At the same time, Class I handlers inside the pool may be forced practically to pay *more than* the Class I price because of extra-regulatory premiums. In sum, the ability of Class III handlers to de-pool under Order No. 30 has negative economic consequences on Class I handlers who must remain within the pool.


**B.  Administrative and District Court Proceedings**

In September 1999, Lamers stopped making required compensating payments into the settlement fund. Instead,

Lamers filed an administrative petition with the USDA for exemption and/or modification of the provisions of Order No. 30. Lamers' petition alleged that Order No. 30 violated equal protection and contravened the AMAA by permitting "unfair trade practices." Lamers sought relief in the form of an order exempting it from pooling and from the obligation to make payments into the producer settlement fund. After an evidentiary hearing, an administrative law judge ("ALJ") sustained Order No. 30 and dismissed Lamers' petition. Lamers appealed to a USDA judicial officer. The judicial officer affirmed the ALJ. Lamers then brought an action in the district court, and the USDA counterclaimed for enforcement of the Secretary's decision.

The district court affirmed the Secretary. It determined that, as to Lamers' "unfair trade practices" claim, Lamers was attempting to sue under a non-existent right. As to Lamers' equal protection claim, the district court noted that the economic regulation was subject to rational basis scrutiny and concluded that the provisions of the regulatory scheme survived challenge under that standard. The district court subsequently ordered Lamers to pay $850,931.26 to the settlement fund. Lamers timely appeals.

## II

## DISCUSSION

### A. Standard of Review

We review de novo the district court's grant of summary judgment. *See Indiana Family & Soc. Servs. Admin. v. Thompson*, 286 F.3d 476, 479 (7th Cir. 2002). All facts are drawn and all inferences viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate

when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### B.  Equal Protection Claims

Lamers contends that the ability of Class III handlers to "de-pool," and its inability to do so, violates its right to equal protection of the law. When considering an equal protection claim, we first must ask whether the governmental action involves fundamental rights or targets a suspect class. *See, e.g., Eby-Brown Co., LLC v. Wisconsin Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002). The distinction drawn by the Secretary between Class I and Class III handlers is based upon the end use to which these handlers put producer milk. It therefore clearly does not involve fundamental rights or target a suspect class and is merely an economic regulation. *See, e.g., id.* Such an economic classification "is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). The presumption applies not only to legislative actions, but also extends to administrative action. *See Pac. States Box & Basket Co. v. White*, 296 U.S. 176, 185-86 (1935); *see also Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994).

We therefore review the Secretary's difference in treatment to determine whether there is a conceivably rational relationship to a legitimate interest. *See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993); *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174-79 (1980). Practically, our review must be highly deferential:

> [E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against

> equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

*Beach Communications*, 508 U.S. at 313. Governmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized. *See Northside Sanitary Landfill, Inc. v. City of Indianapolis*, 902 F.2d 521, 522 (7th Cir. 1990). Furthermore, a circumspect approach is especially appropriate in reviewing a challenge to the federal milk-marketing regime. *See Blair v. Freeman*, 370 F.2d 229, 232 (D.C. Cir. 1966) ("A court's deference to administrative expertise rises to zenith in connection with the intricate complex of regulation of milk-marketing. Any court is chary lest its disarrangement of such a regulatory equilibrium reflect lack of judicial comprehension more than lack of executive authority."); *see also Zuber v. Allen*, 396 U.S. 168, 172 (1969) (describing federal milk-marketing regime as a "labyrinth").

The USDA submits that the different treatment of Class I and Class III handlers is rationally based because of the purposes of regulation and the differing marketing conditions faced by fluid milk and cheese producers. We agree. The AMAA charges the Secretary of Agriculture with establishing and maintaining orderly marketing conditions so as to establish parity prices to farmers. *See* 7 U.S.C. § 602(1). The Secretary also is charged with establishing and maintaining orderly marketing conditions so as to ensure an orderly flow of supply and thereby prevent unreasonably fluctuating prices. *See id.* In order to achieve these legitimate marketing objectives, it is conceivably rational for the Secretary to treat Class I and Class III handlers differently with respect to pooling requirements.

In assessing the rationality of the Secretary's action, we must recall the relevant supply and demand characteristics of the market. As we have noted previously, the milk production industry is highly subject to seasonal fluctuations

and characterized by excess supply. That excess cannot be stored by producers; it must be marketed. Fluid milk products less easily are stored and transported than milk in other forms. They are more perishable and thus more subject to the fluctuations in daily demand. They are generally more highly valued. These circumstances affect the market for producer milk in critical ways and thus provide a rational basis for different pooling requirements among fluid milk and manufacturing handlers. To maintain stability in the milk market, the Secretary reasonably can require that milk used to produce fluid products be pooled while exempting other handlers from obligatory pooling. Indeed, the AMAA is premised on obligatory pooling of Class I milk, so that all producers may partake of its economic benefits. *See Zuber*, 396 U.S. at 180-81 ("The plain thrust of the federal statute was to remove ruinous and self-defeating competition among the producers and permit all farmers to share the benefits of fluid milk profits according to the value of goods produced and services rendered.").

Next, we must keep in mind that "pooling" essentially requires handlers to pay out a uniform minimum price for their supply and is required, in part, to maintain prices for producers. *See Alto Dairy v. Veneman*, 336 F.3d 560, 563 (7th Cir. 2003) (describing milk-pricing system as means of "redistribut[ing] wealth from consumers to producers of milk"). Class I handlers' end use typically represents the "cream of the crop," or the highest end use of Grade A producer milk, and so Class I purchases in the pool generally raise the blend price. Class III handlers, however, can use lower-standard Grade B milk in their products, and their purchases in the pool of higher-standard Grade A milk generally lower the blend price. It is relatively unsurprising, then, that the Secretary deems pooling by Class I handlers vital to the regulatory scheme but deems pooling by Class III handlers less essential, even though price inversions sometimes occur that disrupt normal marketing conditions.

Finally, we note that the history of the milk-marketing regime evidences primary concern with producer competition to make sales to the fluid milk market, not the manufacturing market. *See Zuber*, 396 U.S. at 180-81 (discussing AMAA purpose "to remove ruinous and self-defeating competition" among producers for sales in the fluid milk market); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 343 (1984) (discussing pooling requirements as means "[t]o discourage destabilizing competition among producers for the more desirable fluid milk sales"); *United States v. Rock Royal Co-Op., Inc.*, 307 U.S. 533, 572 (1939) (characterizing system of compensating payments under the settlement fund as "reasonably adapted" device "designed . . . to foster, protect and encourage interstate commerce by smoothing out the difficulties of the surplus and cut-throat competition which burdened" the fluid milk market).[9] Given this driving concern over "ruinous and self-defeating" producer competition in the *fluid* milk market, *Zuber*, 396 U.S. at 180, it is not irrational for the Secretary to allow Class III de-pooling when market incentives are reversed and when sales to the manufacturing market become more attractive to producers.[10]

Lamers' challenge to the exemption of Class III handlers from pooling requirements is essentially one to the breadth

---

[9] *Cf. Alto Dairy v. Veneman*, 336 F.3d 560, 563 (7th Cir. 2003) (describing system of uniform pricing as "price discrimination" and noting that price discrimination increases profits, "thus counteracting the alleged (though almost certainly spurious) tendency of dairy farmers to destroy their business by competing overvigorously").

[10] This conclusion is not affected by the fact that price inversion itself may be perceived of as a "disorderly marketing situation." Milk in the New England and Other Marketing Areas, Dep't of Agric., 64 Fed. Reg. at 16,103.

of the regulatory regime, i.e., the Secretary's failure to require Class III handlers to make compensating payments to the settlement fund when price inversions occur. However, it is well-established that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind" without creating an equal protection violation. *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 489 (1955). As such, "scope-of-coverage provisions" are "virtually unreviewable" because the government "must be allowed leeway to approach a perceived problem incrementally." *Beach Communications*, 508 U.S. at 316.

Similarly, equal protection does not require a governmental entity to "choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 487 (1970). Indeed, "[m]ere underinclusiveness is not fatal to the validity of a law under the Fifth Amendment's guarantee of equal protection." *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002) (internal quotation and citation omitted); *see also Minnesota ex rel. Pearson v. Probate Court of Ramsey County*, 309 U.S. 270, 275 (1940) ("If the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied." (internal quotation and citation omitted)). Furthermore, "broad legislative classification must be judged by reference to characteristics typical of the affected classes." *Califano v. Jobst*, 434 U.S. 47, 55 (1977).

In light of these governing principles, it is clear that Congress and the Secretary can regulate based upon typical milk-marketing conditions without thereby violating equal protection. Here, Congress and the Secretary have chosen to address the perceived problem of excess milk supply in the dairy industry by requiring Class I handlers to pool all their

supply while exempting other handlers from that same requirement, based on an assumption that Class I milk carries the highest market value. They have chosen, in effect, to address the usual situation while not addressing the abnormal, aberrant situation in which Class I milk does not carry the highest market price. Such incremental regulation does not violate equal protection.[11] *See Beach Communications*, 508 U.S. at 316; *see also Brazil-Breashears v. Bilandic*, 53 F.3d 789, 793 (7th Cir. 1995) (noting that the Illinois Supreme Court could act incrementally in restricting judicial employees' political activities, while exempting sitting judges from that restriction, "regardless of the probability that the government will ever address the rest of the problem").

We recognize that the Secretary's exemption of Class III handlers from pooling requirements effectively gives them a competitive advantage. They may participate in pooling when it is beneficial and withdraw when it is not. *See* Milk in the New England and Other Marketing Areas, Dep't of Agric., 64 Fed. Reg. at 16,102. Thus, the Class III pooling exemption is economically harmful to Lamers and other Class I handlers (as well as to producers committed to dealing with them) who must suffer the effects of Class III de-pooling. That harm, however, does not rise to the level of "invidious discrimination." *Williamson*, 348 U.S. at 489. Therefore, it is not a harm we can redress. *See Dandridge*, 397 U.S. at 485 (noting that "[i]n the area of economics and

---

[11] We note further that what Lamers seeks is exemption from the pooling requirement. *See* R.1 at 7. Presumably, Lamers seeks to "de-pool" when the Class I price is higher than the blend price, which is most of the time. Lamers would thereby avoid compensating payments while taking advantage of the controlled market prices. To permit all Class I handlers to so act would vitiate the regulatory scheme devised by Congress.

social welfare," a governmental entity does not violate equal protection "merely because the classifications made by its laws are imperfect," and further stating, "[i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality' " (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911))); *see also Heller v. Doe*, 509 U.S. 312, 319 (1993) ("[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.' " (quoting *Beach Communications*, 508 U.S. at 313)).

In cases involving economic and social regulation, so long as distinctions are conceivably rational, the recourse of a disadvantaged entity lies in the democratic process.[12] *See Beach Communications*, 508 U.S. at 314 (" 'The Constitution presumes that, absent some reason to infer antipathy, even

---

[12] By way of example, we note that, in 1999, the Secretary responded to industry complaints about price inversions by adjusting the Class I advanced pricing procedure in an attempt to limit the price-inversion phenomenon:

> The advanced pricing procedure provided in this final decision results in a Class I price that is based on a more recent manufacturing use price, thus reducing (but not eliminating) the time lag that contributes to class price inversion . . . .
>
>          . . . .
>
>     . . . [R]educing the time period for which Class I pricing is advanced should reduce the potential [of price inversions] considerably, allowing Class I handlers to compete more effectively with manufacturing plants for fluid milk.

Milk in the New England and Other Marketing Areas, Dep't of Agric., 64 Fed. Reg. at 16,103.

improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (footnote omitted))); *see also Eby-Brown*, 295 F.3d at 754 (noting that improvident decisions "should be rectified through the democratic process and not the courts"). Lamers' equal protection claim based on the different pooling regulations governing Class I and Class III handlers must therefore fail.

We briefly address one additional issue under the rubric of equal protection analysis. Lamers submits that the failure of the regulations to account for certain out-of-pocket premiums it must pay to attract its supply violates its right to equal protection. Lamers' equal protection claim based on these premiums is fundamentally flawed because Lamers presents no *distinction* for this court to review. Specifically, Lamers has demonstrated no difference between it and any other handler as to the Secretary's treatment of these out-of-pocket premiums; the regulations simply do not take them into account.[13]

---

[13] Lamers argues distinction based on the AMAA requirement that "the *total sums paid* by each handler shall equal the value of the milk purchased by him at the prices fixed." 7 U.S.C. § 608c(5)(C) (emphasis added). Because the Secretary does not account for out-of-pocket premiums, the calculation of the "total sums paid" does not accurately reflect the cost of some handlers' supplies. In the case of handlers not obligated by market realities to pay such premiums, the Secretary's "total sums paid" calculation more accurately reflects the cost of their supply. This practical effect results: Handlers paying out-of-pocket premiums owe larger compensating payments to the settlement fund than they would owe if the Secretary took supply premiums into account.

Even if we treat Lamers' complaint as somehow raising an equal protection claim, it fails. Although some handlers may be able to attract supply without paying such premiums, the Secretary's decision not to give any handler credit for such competitive costs does not thereby rise to an equal protection violation. *Cf. Eby-Brown*, 295 F.3d at 754-55 (determining that statute, which prohibited certain tobacco wholesalers from deducting "trade discounts" from costs but permitted other wholesalers to deduct such costs, did not violate equal protection). It is conceivably rational that accounting for such extra-regulatory costs of competition would hinder the objectives of the regulatory scheme, in that it would reduce payments to the settlement fund. Furthermore, as we have discussed, the Secretary is permitted to engage in incremental regulation. *See, e.g.*, *Williamson*, 348 U.S. at 489 ("The legislature may select one phase of one field and apply a remedy there, neglecting the others. . . . The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." (citation omitted)). Thus, the Secretary's treatment of premiums survives scrutiny.

## C.  "Unfair Trade Practices" Claim

Lamers argues that four aspects of Order No. 30 constitute "unfair trade practices" prohibited by 7 U.S.C. § 608c(7)(A): (1) the ability of Class III handlers to de-pool; (2) the requirement that Class I handlers pay into the settlement fund when competing handlers dealing in both the fluid milk and the manufacturing markets may draw upon those funds; (3) the allowance of some manufacturing costs in the calculation of Class III and IV utilization prices; and (4) the ability of some processing plants to receive "kickbacks" for qualifying milk under the order.

Lamers' claim of "unfair trade practices" warrants only brief discussion, however, because, as the district court concluded,

Lamers attempts to proceed under a non-existent statutory right. Under 7 U.S.C. § 608c(7)(A), the prohibition of "unfair methods of competition and unfair trade practices in the handling of" agricultural commodities is one of several "terms and conditions" that the Secretary may incorporate in orders issued under the AMAA.[14] It is not an independent statutory prohibition, and the Secretary is not required to include it in any order. Furthermore, the Secretary did not include the prohibition in Order No. 30. Therefore, Lamers lacks a statutory basis upon which to bring this claim.

Were it possible to construe Lamers' claim as an argument that the Secretary has advanced an unreasonable interpretation of the AMAA by enacting regulations that permit these allegedly "unfair trade practices," we first would be required to determine the appropriate level of deference that must be accorded the Secretary's interpretation of the AMAA, assuming that interpretation did not contravene statutory directives, and next would be required to determine whether the Secretary's interpretation represented a permissible construction under the appropriate level of deference.[15]

---

[14] The relevant text of 7 U.S.C. § 608c(7) provides:

> In the case of the agricultural commodities and the products thereof specified . . . orders shall contain one or more of the following terms and conditions:
>
> > (A) Prohibiting unfair methods of competition and unfair trade practices in the handling thereof.
>
> . . .

[15] The USDA submits that Lamers must establish that its actions are "so arbitrary or patently inconsistent with congressional purposes as to exceed [the] statutory delegation of legislative authority." *See* Appellee's Br. at 33. It further submits that none of the complained-of practices are arbitrary or patently inconsis-

(continued...)

*See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984). We need not decide this issue, however, because it is not possible to construe Lamers' arguments as reaching beyond a claim that the Secretary has failed to enforce an AMAA prohibition on "unfair trade practices."[16] *See* Appellant's Br. at 20 ("[T]he USDA is not

---

[15] (...continued)
tent with congressional purposes because each is related to the objective of stabilizing competition among farmers for sales in the fluid market: First, because Congress was concerned about competition among farmers competing in the fluid milk market and not in the cheese market, it is permissible for cheese processors to de-pool. Second, marketwide pooling expressly is authorized by 7 U.S.C. § 608c(5) and cannot be an unfair trade practice under that statute even though some handlers competing in the fluid market are entitled to draw payments from the fund in relation to their manufacturing purchases. Third, the manufacturing allowance is simply a factor used to compute the utilization price of Class III and Class IV raw milk. *See* 7 C.F.R. § 1000.50. Fourth, the arrangements between large processors and other plants enable additional plants to qualify for the order and constitute efficient systems of supply in the market. For these reasons, the USDA contends that the Secretary's decision to allow these practices withstands review. *See* Appellee's Br. at 32-35. We need not and do not decide these issues although we note that significant deference would be accorded the Secretary's interpretation of the statute it is charged with administering. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984).

[16] We shall not make the argument for Lamers. *Cf. Franklin v. Gilmore*, 188 F.3d 877, 884 (7th Cir. 1999) (noting that plaintiff failed to make an argument excusing procedural default and declining to "make it for him"); *Stagman v. Ryan*, 176 F.3d 986, 995 n.2 (7th Cir. 1999) (declining to make admissibility arguments for
(continued...)

enforcing the specific prohibition contained in the AMAA as to unfair competition."); Appellant's Reply Br. at 14 ("[T]he USDA is not administering the AMAA in such a manner as to avoid violating the specific prohibition contained in the AMAA as to unfair competition."). As noted, no such prohibition exists.

## Conclusion

Lamers has not established an equal protection violation and cannot bring an "unfair trade practices" claim. For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

---

[16] (...continued) plaintiff when on appeal plaintiff relied on evidence found inadmissible by the district court).

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*